UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BRENDA SCHAIT,                                              ECF CASE

                                    Plaintiff,
                                                           COMPLAINT
- against -

PENGUIN RANDOM HOUSE LLC,                                   PLAINTIFF   DEMANDS   A
                                                           TRIAL BY JURY
                                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff Brenda Schait ("Schait" or "Plaintiff"), through her attorneys Vladeck,

Raskin & Clark, P.C., complains of Defendant Penguin Random House LLC ("PRH" or the

"Company" or "Defendant") as follows:

                            NATURE OF ACTION

        1.      Schait is an experienced marketing professional and has over 25 years of

experience in the television industry, working on production and promotion of children's

television programming; her accolades include a Daytime Emmy. Schait suffers from

degenerative disc disease and nerve compression in her neck and lumbar spine with compressed

nerves in her left arm and right leg, and other medical problems with her back, neck, hip, and

right leg that cause her severe chronic pain when left untreated; these conditions make it difficult

for her to perform basic tasks. In addition, Schait suffers from anxiety and depression.

        2.      After working at Random House Children's Books ("Random House"), a

division of PRH, for over a year, in the fall of 2016, Schait began experiencing pain in her back

and hip, which reflected a flare up of her medical condition, and began seeking a reasonable

accommodation for her disability. PRH delayed, failed to respond to requests, refused to engage

in the interactive process the Americans with Disabilities Act ("ADA") and state and city laws require, and failed to accommodate Schait's continuing disability in any meaningful way. In 2017, Schait experienced a major depressive disorder caused by her chronic pain and worsened by Defendant's failure to accommodate her condition. Defendant thus forced Schait to take numerous short-term disability leaves that she would not have required if Defendant had agreed to other less restrictive measures. PRH's refusal to reasonably accommodate Schait culminated in PRH's discriminatory decision to fire Schait in January 2019.

3.     Plaintiff brings this action to remedy Defendant's discrimination, retaliation, and failure to accommodate her disabilities in violation of the ADA, 42 U.S.C. § 12101 et seq.; the New York State Human Rights Law, Executive Law § 290 et seq. (the "NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code § 8-101 et seq. (the "NYCHRL").

4.     Plaintiff seeks injunctive and declaratory relief, compensatory and punitive damages, and other appropriate legal and equitable relief pursuant to the ADA, the NYSHRL, and the NYCHRL.

<u>PARTIES, JURISDICTION, AND VENUE</u>

5.     Plaintiff is a resident of West Orange, New Jersey.

6.     Plaintiff is an individual with a disability within the meaning of the NYSHRL and NYCHRL and a qualified individual with a disability within the meaning of the ADA.

7.     PRH is one of the largest publishing companies in the world, with more than 10,000 employees and offices in more than a dozen countries. Among its many divisions is

Random House Children's Books, which oversees the publication, marketing, and promotion of children-focused books. PRH's headquarters are located in New York, New York.

8.     This Court has jurisdiction over Plaintiff's ADA claim under 28 U.S.C. § 1331 because those claims arise under federal law. This Court has supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims pursuant to 28 U.S.C. § 1367 because these claims relate closely to the ADA claim, having arisen from a common nucleus of operative facts such that all claims form part of the same case or controversy.

9.     This Court has personal jurisdiction over PRH in New York, as its headquarters are located there.

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant PRH's headquarters are located in New York, New York. Additionally, Plaintiff worked in New York, New York, and the majority of the events giving rise to the Plaintiff's claims occurred there.

11.     Plaintiff filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC") on or about August 7, 2019, complaining of failure to offer reasonable accommodations, disability discrimination, and retaliation alleged herein. On or about September 30, 2020, the EEOC issued Plaintiff a notice informing her of her right to sue PRH. Plaintiff has thus complied fully with all prerequisites required by the ADA.

12.     Pursuant to section 8-502(c) of the NYCHRL, Plaintiff shall serve a copy of this Complaint on the City of New York Commission on Human Rights and the City of New York Corporation Counsel within 10 days of commencement of this action.

FACTUAL ALLEGATIONS

Schait's Successful Career

13.     Schait has worked in television and media for over 25 years, with an emphasis on children's programming and marketing.

14.     Schait holds a Bachelor of Arts from Montclair State University, where she graduated cum laude with a degree in Speech & Theater / Broadcasting. In the 1990s, Schait worked at Nickelodeon on shows, such as Kenan & Kel, All That, and Allegra's Window, holding production roles such as script supervisor, post-production supervisor, and associate producer.

15.     In or around 1999, Schait shifted to also working on the marketing and promotion of television shows at Nickelodeon, a children's television network, and served as a Brand Creative Manager at "Noggin" and "The N," Nickelodeon sub-brands that are now called "Nick Jr." and "TeenNick." She supervised all promotion projects and managed a budget of over $3 million until 2003. She then took other roles in children's and daytime television and freelanced for several years.

16.     In November 2007, Schait began working as a writer on "Cash Cab," a quiz show on the Discovery Channel. Her work received a Daytime Entertainment Emmy for Outstanding Game / Audience Participation Show in 2009. Schait also served as a writer and researcher on "Who Wants To Be A Millionaire" for more than two years; she received writing credits for over 175 episodes. In 2009, "Who Wants To Be A Millionaire" was also nominated for a Daytime Emmy, and Schait's name was included on the nomination as a member of the writing staff.

17.     In January 2007 and again in 2009, Schait rejoined Nickelodeon as the Director of Production on a temporary basis to cover the work of an employee out on maternity leave. As the Director of Production, she oversaw production of promotions, including the award-winning rebranding in 2009, from inception to final delivery at "Nicktoons," one of Nickelodeon's channels. Then, in or around September 2010, Schait joined Nickelodeon full-time with the title of Graphics Manager. In that capacity, she oversaw production of promotion graphics for certain Nickelodeon content, such as Power Rangers, a popular children's television show.

18.     In or around June 2013, Nickelodeon promoted Schait to Project Manager. In that position, Schait managed all promotional projects concerning "NickMom" and "Nicktoons" programming. Schait remained in that role until in or around March 2015, when her position was eliminated in a round of company-wide layoffs at Nickelodeon.

### Schait's Employment at Random House

19.     In May 2015, Schait began freelancing at Random House as a Content Producer, Digital Marketing; she worked closely with Alison Folino ("Folino"), who upon information and belief, held the title of Managing Producer, Brands & Licenses. Folino's title changed to Digital Associate Director, Brands & Licenses – Digital, sometime in or around 2015 or 2016.

20.     In November 2015, Schait was offered and accepted a full-time position as a Senior Content Producer, Digital Marketing within the marketing department of Random House Children's Books. As Senior Content Producer for Random House Children's Books, Schait worked on promotional planning, creation, and scheduling, as well as content creation, for some of PRH's largest and most profitable brands. For example, Schait was responsible for all

content, events, and site launches for PRH's Dr. Seuss website, Seussville.com. This work involved creating digital content and promotions to tie-in with broader efforts to market Dr. Seuss books, products, and events.

21.     In mid-2016, Kate Keating ("Keating") joined PRH and became Folino's supervisor. Upon information and belief, Keating's role was Director, Digital Marketing. Keating in turn reported to John Adamo ("Adamo"), a Senior Vice President of Marketing at PRH.

<u>Schait's Disability Resurfaces</u>

22.     Prior to joining PRH, Schait had a history for more than 30 years of medical problems with her back, neck, hip, and right leg. Specifically, by 2016 that history included osteoarthritis, degenerative disc disease with bulging discs and nerve compression in the L3-4 and L4-5 spinal segments, restless leg syndrome (also known as Willis-Ekbom Disease), and a mild tear of the connecting cartilage in her right hip. Schait's condition sometimes flares up, causing her severe pain that radiates to her right hip, pelvis, and leg. This condition also causes occasional weakness and numbness in her right leg and foot.

23.     In or around September 2016, Schait began experiencing a flare up, causing her severe pain. She also suffered from lumbar sprain and gluteal tendinitis related to her underlying back, neck, hip, and leg problems. Schait began seeking medical treatment and her doctors prescribed strong painkillers. Schait informed her supervisor, Folino, of her medical problems.

24.     Folino then granted Schait permission to work on a flexible schedule, occasionally working from home and sometimes working from 10 a.m. to 6 p.m. instead of her usual schedule of 9 a.m. to 5 p.m. in the office. That modification accommodated her difficulties

6

in commuting to work and attending doctors' appointments. At the time, Schait lived in West Orange, NJ, and her round-trip commute to PRH offices was approximately three hours.

### PRH Fails to Engage with Schait's First Reasonable Accommodation Request

### PRH Requires Schait to Take Short-Term Disability Leave

25.    In October 2016, Schait began considering formalizing her arrangement with Folino by officially seeking a reasonable accommodation. Schait emailed Ali Biber ("Biber") in PRH's HR department to let her know that Schait might be requesting a reasonable accommodation in the near future.

26.    While Schait considered whether to pursue a formal reasonable accommodation request, upon information and belief, one of her co-workers, a woman in her mid-20s or early 30s not suffering from any apparent disabilities, began telling other colleagues that Schait was consistently late for work. The co-worker was referring to Schait's arriving at work at 10 a.m. per her agreement with Folino rather than rather than arriving at 9 a.m. As a result, Schait became concerned that without a formal reasonable accommodation, her schedule would be viewed as a performance problem.

27.    In November 2016, Schait followed up in-person with Biber and requested information about how to apply for a reasonable accommodation. Schait also discussed the possible accommodation with Folino, who expressed her approval.

28.    After not hearing back from Biber for over a month, Schait sent a January 10, 2017 email asking for a flexible schedule. She requested a 10 a.m. to 6 p.m. workday rather than a 9 a.m. to 5 p.m. workday; and one day of remote work per week, which would allow her to attend physical therapy.

29.    After still not receiving any response, Schait emailed again on January 20, and then again on February 1, 2017. She directed the February 1 request to Lisa Clark ("Clark"), Biber's supervisor, a Director of Human Resources ("HR") at PRH.

30.    On February 2, 2017, Schait met with Clark, who made clear that she had no knowledge of the obligation to provide reasonable accommodations under the ADA. Clark stated that a temporary schedule change would not be considered a reasonable accommodation. Clark's assertion was contrary to EEOC guidelines which stated that, absent undue hardship, employers must allow an employee to work a modified schedule as a reasonable accommodation. Clark instead pushed for Schait to take short-term disability leave.

31.    Clark then directed Schait to PRH's Employee Benefits department, who redirected her to a Company-employed nurse, Laura Mullahy ("Mullahy"). Mullahy told Schait, in sum and substance, that no paperwork was involved in requesting a reasonable accommodation and that flexible schedules and work-from-home days were often granted to employees, especially to female employees returning from maternity leave.

32.    Schait then sought approval from her immediate supervisor, Folino, who again approved Schait's request. However, Folino needed authorization from her supervisors, Keating and Adamo, as well. Keating and Adamo objected to the reasonable accommodation Schait sought.

33.    Though PRH denied Schait the accommodation she sought for her disability, upon information and belief, other employees were able to obtain such a flexible schedule and work-from-home arrangement. Those employees were accorded accommodation because of non-disability related concerns such as having a long commute or having young children at home.

8

34.     In or around March 2017, Schait continued to experience severe and persistent chronic pain that was particularly difficult when she commuted to work during rush hour. Unable to obtain a reasonable accommodation that would allow her to attend physical therapy regularly or come to the office on a modified schedule, Schait was forced to accept the one option PRH presented: taking short-term disability leave.

35.     Schait's leave began on March 9, 2017. Had Schait been permitted reasonable flexibility with her work hours, allowed to work remotely, or given any other effective reasonable accommodation, she would not have needed the short-term disability leave and could have continued to work. As a result of her worsening physical condition and PRH's failure to provide her with a reasonable accommodation, Schait's depression and extreme anxiety returned.

<u>Schait Returns to Work and Again Seeks a Reasonable Accommodation</u>

36.     On June 30, 2017, Schait began her transition back to working at PRH's offices, at first working part-time. Schait continued to experience significant pain because of her back and hip. In addition, PRH's treatment and her chronic pain had exacerbated Schait's depression and anxiety. As a result, during this time, Schait was suffering from a major depressive disorder and was taking four different medications for that condition alone. These medications came with numerous serious side effects, including dizziness, bowel irritation, headaches, constant ringing in her ears, and sudden muscle spasms. As a result of these side effects, Schait often lost her balance and fell while walking, and occasionally due to muscle spasms broke items she was carrying or was close to.

37.     In August 2017, Folino gave Schait informal permission to work remotely several days a week; that accommodation was successful. Schait also sometimes worked in the

office on certain days between August 2017 and September 2017. In any event, Schait was able to perform all of her job responsibilities remotely, including managing PRH brand websites, developing content for digital marketing campaigns, and collaborating with coworkers by email and phone.

38.     At the same time Schait was transitioning back to working full-time, PRH management, specifically Keating, were drastically increasing her workload. Nevertheless, Schait was able to perform all of her tasks and meet all deadlines while working remotely. Schait worked from at least 9 a.m. to 6 p.m., but often worked long days of up to eleven hours in order to complete her increased workload.

39.     Keating also directed unwarranted criticism at Schait and sought excuses to berate and humiliate her due to her actual and perceived disability. For example, in group emails with other PRH employees, Keating often criticized Schait's performance; Keating also falsely accused Schait of failing to consult with a colleague when Schait in fact had done so. Meanwhile, Folino continued to praise Schait's performance.

40.     In addition, PRH management – especially Keating – often interfered with Schait's continuing medical treatment. Although Schait advised her supervisors, including Keating, of these appointments, Keating, sent Schait urgent requests at times when Schait had doctors' appointments scheduled. Schait was often left with the dilemma of either cancelling the doctors' appointments and physical therapy sessions essential to her recovery or attending the doctors' appointments and physical therapy sessions and missing work deadlines. Schait often prioritized work over her health, making it more difficult for her to transition back to working full-time in the office.

41.     Schait continued to meet all her deadlines and complete all her work assignments.  As a result of the discriminatory treatment by PRH, Schait's health deteriorated.

42.     Beginning in early September 2017, Schait sought to formalize the informal work-from-home arrangement she had agreed upon with Folino. Schait explained that this accommodation would permit her to schedule treatments and doctors' appointments to help her improve her back and hip condition. In addition, working from home would help her avoid the long and painful commute into work. Schait's ability to commute to work was also affected by medication she was taking which made it difficult for her to walk or spend any extended period of time on the bus.

43.     Schait inquired into numerous options to accommodate her work and medical condition, including a part-time salaried position and a four-day workweek consisting of 10 hours per day. Keating instead told Schait that her only option for increased flexibility was to return to freelance work, which would cause Schait to lose the insurance she needed to continue her treatment.

44.     On September 26, 2017, Schait requested a reasonable accommodation of working from home full-time and modifying her hours on Tuesdays and Thursdays from 9 a.m. to 5 p.m. to 8 a.m. to 4 p.m. The proposed accommodation was for a limited period of time until late December 2017. Upon information and belief, although Folino knew Schait could perform her job remotely, Keating refused to provide Schait with this reasonable accommodation.

45.     In October, PRH wrote Schait that the accommodation would be granted through December 1, 2017, but then Schait would be required to return to the office full time. The purported reason for the denial of Schait's request was that, "this current role is not a W[ork] F[rom] H[ome] role and requires a full-time employee who sits in the NYC PRH office."

46.     Once again, PRH denied Schait an accommodation because of Defendant's rigid determination that Schait's job "sits in the NYCY PRH" office.  PRH refused to consider whether Schait's position could be performed remotely, as the ADA requires.

47.     Due to the increased workload she received after returning from disability leave, Schait found herself in a difficult situation, forced again to choose between her health and her job. On or around October 25, 2017, Schait wrote to Folino that she needed to begin rescheduling appointments and treatments "that my WFH accommodation was supposed to allow time for, but that I have had to frequently cancel, because you and I (but I can only speak for me) are expected to do the work of a team of twenty, with little to no support, and deadlines that are 100% inflexible and nearly impossible to meet, but that I cannot afford to miss for fear of losing my job." Schait added, "not only have the abovementioned conditions made it impossible for me to maintain the regular schedule of medical treatments needed to deal with my existing health issues, but [those conditions are] making me sicker." In this situation, Schait continued to prioritize work; she met all deadlines and completed all assignments.

48.     In November 2017, Schait requested an extension of her informal work-from-home arrangement until February 2018 to accommodate her continuing treatment. Letters from her neurologist, Dr. Guha Venkatraman ("Dr. Venkatraman"), and her psychiatrist, Dr. Robert Dengrove ("Dr. Dengrove") supported Schait's request. Dr. Venkatraman wrote that Schait needed to finish her work by "no later than 5 pm" in order to attend physical therapy sessions.  He noted that Schait had already had to cancel treatment sessions because of her work schedule which was counterproductive to the treatment she was receiving. Dr. Dengrove wrote that Schait needed to work from home for three months so that she could receive medical

treatment for chronic pain and depression. He recommended that Schait attend physical therapy three times a week and cognitive therapy two or three times a week in order to recover.

49.     On or about December 12, 2017, Clark, writing as a representative of HR, denied the temporary reasonable accommodation request. Clark stated, "I want to make it clear that this is a full-time, in-office position." In rejecting Schait's accommodation request, PRH repeatedly characterized her request as permanent even though she had clearly requested only a temporary accommodation. Schait's request included working additional hours to make up any time lost a result of medical appointments during the day.  Nevertheless, Clark faulted Schait for having weekday medical appointments in New Jersey, some of which would "take much longer than a usual lunchtime."

50.     Clark then offered Schait the first official reasonable accommodation she had been granted during the more than thirteen months that she had been requesting one from PRH. Under Clark's proposal, Schait would work from home five days a week until January 1, 2018, then three days from home and two days in the office from January 2, 2018 to February 2, 2018. Clark wrote, "This will give you time to work with your doctors to schedule your appointments around work hours, or if necessary to help you find New York City based doctors in closer proximity to the PRH office, as well as appointment hours prior to work, during lunch or after work hours as needed." PRH further stated that the proposed accommodation would end on February 2, 2018 and could not be extended "using PTO/sick days." PRH stated that after February 2, 2018, Schait's only options were to work full-time in the office or to "seek alternate employment."

51.    The accommodation Clark offered Schait was inconsistent with the flexible arrangements PRH offered to non-disabled employees and incompatible with Schait's treatment needs. PRH offered that plan unilaterally without engaging in an interactive process.

52.    In December 2017, PRH management, specifically Adamo, Keating's supervisor, retaliated against Schait and decided she was ineligible for a merit-based salary increase because of her accommodation request.

53.    Because the plan PRH HR proposed was not compatible with the advice of her doctors, Schait had no choice but to go again on short-term disability leave in January 2018.

54.    Around the same time, on or around January 8, 2018, Folino wrote to Clark and Keating about Schait's job performance. Folino stated that Schait, "without question goes above and beyond to get the job done" and referred to Schait as a "top-notch producer." Folino added that she relied on Schait "immensely" and could "trust that she will make sure everything is taken care of[.]" Folino added that Schait was a "valued member of my team and I certainly don't want to lose her."

<u>PRH Again Denies A Reasonable Accommodation Schait Needed for the Transition Back To Work</u>

55.    In or around the end of June 2018, Schait opened discussions with PRH about reasonable accommodations about her return to work from short-term disability leave.

56.    Due to PRH's discriminatory treatment, Schait, during her short-term disability leave, had developed agoraphobia and a panic disorder which hindered her ability to travel to New York City for work. Her depression also made such commuting difficult. These conditions made it impossible for Schait to return immediately to working in the office full-time even if she was ready to return to work generally. Schait's doctor believed that Schait would be

able to overcome her panic disorder and agoraphobia if she were permitted to transition slowly back to working in the office after she resumed her duties and responsibilities.

57.     Upon the advice of Dr. Dengrove, Schait requested a return-to-work date of July 29, 2018 along with a transition back to full-time in-office work. Schait proposed working from home full-time for the first two weeks after her leave; then every two weeks thereafter, Schait would add to her routine one addition day of working in the office. Under Schait's proposed plan, by the start of Schait's eleventh week back at work, she would be full-time in the office. The plan was designed to help Schait deal with her agoraphobia and panic disorder by desensitizing her over time to her commute, Manhattan, and the office setting; that accommodation would allow Schait to return to working in PRH's Manhattan offices full-time. Dr. Dengrove wrote on or about June 26, 2018 that Schait was still not able to complete "dry-runs" into New York City without panicking.

58.     On or about July 19, 2018, James Smith ("Smith"), a PRH HR representative, told Schait that PRH would "review what accommodations would be possible" upon her return to work on July 30, 2018. Smith emphasized that it was "unlikely [PRH] will be able to accommodate the full phased return-to-work plan" Schait had requested because her position was "one that must be done in the office." PRH thus ignored that the essential functions of Schait's position could be and had been successfully performed remotely. Schait had done so for several months in late 2017 while working from home. Nevertheless, Smith stated that if Schait did not return to the office on a full-time basis on July 30, 2019, she would be on "unapproved leave" and her absence might "constitut[e] job abandonment, which can result in termination."

15

59.     On or about July 25, 2018, Dr. Dengrove advised Schait that he did not believe she would be able to return to work on July 30, 2018.  He instead recommended that she return to work on August 30, 2018; Schait advised PRH of her doctor's determination.

60.     On or about August 16, 2018, Dr. Dengrove again advised Schait that it was too soon for her to return to work. Dr. Dengrove stated that Schait's "continuing depression, and panic disorder with agoraphobia have required additional medication changes, which need time to become effective, as well as various behavioral interventions to desensitize [her] fears." He therefore recommended a return-to-work date of October 29, 2018 with a transition period.

61.     In response, Smith explained that the only reasonable accommodation that PRH would consider was granting Schait addition leave until her return to work. He stated that any other accommodation, including a temporary period of working from home, would not be possible. Schait replied that she "want[ed] to get back to work" and stated that, "[t]he sooner I re-engage with the team and my projects, the sooner I'll be able to [return to work] full time."

62.     On or about September 25, 2018, Schait informed Smith that, upon the advice of Dr. Dengrove, she was able to return to work immediately so long as she could work from home initially and gradually transition to working full-time in the office.

63.     PRH did not respond to Schait's doctor's evaluation. On October 10, 2018, Schait reiterated to Smith that she was prepared to start working again as soon as possible, but with the phase-in to office responsibilities her doctor had recommended.

64.     The next day, Smith rejected any attempt by Schait to obtain a reasonable accommodation that included working from home on a temporary basis.  Smith claimed that there were several temporary workers and freelancers covering Schait's responsibilities and that "[t]he department is organized differently than it was the last time [she was] in the office." Upon

16

information and belief, PRH was not using temporary workers or freelancers to cover Schait's responsibilities and the Digital Marketing Department did not undergo a reorganization while Schait was on leave.

65.     Schait continued to tell PRH that she was willing and ready to return to work so long as there was some transition period from working full time at home to working full time in the office.  However, PRH continued to refuse to consider this accommodation.  Smith stated that, "at the most," PRH would agree to Schait working from home one day per week.

66.     PRH informed Schait that she was expected to return to work in the office on January 8, 2019. On or about January 7, 2018, Smith reiterated that Schait had to be in the office the next day. Smith again denied Schait's request to work from home until Schait and PRH could reach an agreement on a reasonable accommodation that would allow her to transition to full time in the office.

<u>PRH Unlawfully Fires Schait</u>

67.     On or about January 10, 2019, PRH told Schait that because there was no resolution of the process for Schait's returning to work, PRH had decided to fire her.  Schait would remain on PRH's payroll through February 1, 2019.

68.     PRH falsely accused Schait of declining to participate in conversations about a possible accommodation and ignored Schait's multiple attempts to communicate with PRH on this issue. PRH erroneously accused Schait of being inflexible even though the Company categorically refused to consider any accommodation other than an extension of her leave period.

69.     On or around February 4, 2019, Smith sent Schait an email confirming that PRH had terminated her employment on February 1, 2019.

70.     On information and belief, in or around March 2019, PRH announced a new flexible work policy which would permit all PRH employees to work at least one day per week remotely. The policy would also give all PRH employees flexibility in setting their work schedule by adjusting regular start and end times for each workday.

71.     On information and belief, PRH replaced Schait with a new hire who did not require any accommodations for a disability and did not have any known or apparent disability.

## FIRST CAUSE OF ACTION
### ADA: Failure to Accommodate

72.     Plaintiff repeats and realleges paragraphs 1 through 71 above.

73.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the ADA.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA. Defendant had notice of Plaintiff's disability.

74.     With reasonable accommodation, Plaintiff could have performed the essential functions of her job and Defendant refused to make such accommodations.

75.     Defendant has acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

76.     As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
### NYSHRL: Failure to Accommodate

77.     Plaintiff repeats and realleges paragraphs 1 through 76 above.

78.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the NYSHRL.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times an "individual with a disability" within the meaning of the NYSHRL. Defendant had notice of Plaintiff's disability.

79.     With reasonable accommodation, Plaintiff could have performed the essential functions of her job and Defendant refused to make such accommodations.

80.     Defendant has acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

81.     As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

<u>THIRD CAUSE OF ACTION</u>
<u>NYCHRL: Failure to Accommodate</u>

82.     Plaintiff repeats and realleges paragraphs 1 through 81 above.

83.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the NYCHRL.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times an "individual with a disability" within the meaning of the NYCHRL. Defendant had notice of Plaintiff's disability.

84.     With reasonable accommodation, Plaintiff could have performed the essential functions of her job.

85.     Defendant refused to make such accommodations and/or failed to engage in a good faith individualized, interactive process to consider a reasonable accommodation.

86.     Defendant has acted intentionally and with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

87.     As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer economic losses, irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION
### ADA: Discrimination

88.     Plaintiff repeats and realleges paragraphs 1 through 87 above.

89.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the ADA.  Plaintiff was able to perform the essential functions of the job with a reasonable accommodation, and therefore was at all relevant times a "qualified individual with a disability" within the meaning of the ADA.

90.     By the acts and practices described above, Defendant discriminated against Plaintiff on the basis of her disability in violation of the ADA.

91.     Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights.

92.     Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of discriminatory practices by Defendant.

## FIFTH CAUSE OF ACTION
### NYSHRL: Disability Discrimination

93.     Plaintiff repeats and realleges paragraphs 1 through 92 above.

94.     Plaintiff has had, at all relevant times, a "disability" as that term is defined in the NYSHRL. Plaintiff's disability did not prevent her from performing her job with a reasonable accommodation.

95. By the acts and practices described above, Defendant discriminated against Plaintiff on the basis of her disability, in violation of the NYSHRL.

96. Defendant acted with malice and/or reckless indifference to Plaintiff's rights protected under the NYSHRL.

97. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant's discriminatory practices.

SIXTH CAUSE OF ACTION
NYCHRL: Disability Discrimination

98. Plaintiff repeats and realleges paragraphs 1 through 97 above.

99. Plaintiff has had, at all relevant times, a "disability" as that term is defined in the NYCHRL.  Plaintiff's disability did not prevent her from satisfying the essential requisites of her job with a reasonable accommodation.

100. By the acts and practices described above, Defendant discriminated against Plaintiff on the basis of her disability, in violation of the NYCHRL.

101. Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant's discriminatory practices.

102. Defendant engaged in the discriminatory conduct with conscious or reckless disregard of Plaintiff's rights

SEVENTH CAUSE OF ACTION
ADA: Retaliation

103. Plaintiff repeats and realleges paragraphs 1 through 102 above.

104.    By the acts and practices described above, Defendant retaliated against Plaintiff for her requesting a reasonable accommodation and for opposing Defendant's unlawful conduct, in violation of the ADA.

105.    Defendant acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

106.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of the retaliatory acts by Defendant.

<u>EIGHTH CAUSE OF ACTION</u>
<u>NYSHRL: Retaliation</u>

107.    Plaintiff repeats and realleges paragraphs 1 through 106 above.

108.    By the acts and practices described above, Defendant retaliated against Plaintiff for her requesting a reasonable accommodation and for opposing Defendant's unlawful conduct, in violation of the NYSHRL.

109.    Defendant acted with malice and/or reckless indifference to Plaintiff's rights protected under the NYSHRL.

110.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant's retaliatory acts.

<u>NINTH CAUSE OF ACTION</u>
<u>NYCHRL: Retaliation</u>

111.    Plaintiff repeats and realleges paragraphs 1 through 110 above.

112.    By the acts and practices described above, Defendant retaliated against Plaintiff for her requesting a reasonable accommodation and for opposing Defendant's unlawful conduct, in violation of the NYCHRL.

113.    Plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and other compensable damages as a result of Defendant's retaliatory acts.

114.    Defendant engaged in the retaliatory conduct with conscious or reckless disregard of Plaintiff's rights.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that the acts and practices complained of herein are in violation of the ADA, the NYSHRL, and the NYCHRL;

b.      enjoining and permanently restraining these violations of the ADA, the NYSHRL, and the NYCHRL;

c.      directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

d.      directing Defendant to place Plaintiff in the position she would have occupied but for Defendant's discriminatory and retaliatory conduct and making her whole for all earnings and other benefits she would have received but for Defendant's discriminatory treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.      directing Defendant to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, and pain and suffering;

     f.     directing Defendant to pay Plaintiff punitive damages;

     g.     awarding Plaintiff her reasonable attorneys' fees and costs;

     h.     awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

     i.     granting Plaintiff a tax enhancement award to offset adverse tax consequences associated with a lump sum award of damages; and granting such other and further relief as the Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
       December 23, 2020

                    VLADECK, RASKIN & CLARK, P.C.

                 By:       /s
                    Debra Raskin
                    Kathleen C. Riley
                    Attorneys for Plaintiff
                    565 Fifth Avenue, 9th Floor
                    New York, New York 10017
                    (212) 403-7300